# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1) STEPHEN SALLEE and<br>2) ANNE SALLEE,<br>Individually and on behalf of all others<br>similarly situated,<br><br>      Plaintiffs,<br><br>   vs.<br><br>1) DOLLAR THRIFTY AUTOMOTIVE<br>GROUP, INC. (d/b/a DOLLAR RENT A<br>CAR),<br>2) DOLLAR RENT A CAR, INC., and<br>3) DTG OPERATIONS, INC.,<br><br>     Defendants. | Case No. 14-cv-250-GKF-PJC<br><br>**FIRST AMENDED<br>CLASS ACTION COMPLAINT<br>JURY TRIAL DEMANDED** |

430519.1

Plaintiffs Stephen Sallee and Anne Sallee, ("Plaintiffs"), individually and on behalf of all others similarly situated, for their Class Action Complaint against Defendants Dollar Thrifty Automotive Group, Inc. (d/b/a Dollar Rent A Car); Dollar Rent A Car, Inc.; DTG Operations, Inc. (together "Dollar" or the "Company"), by and through their undersigned attorneys, allege upon personal knowledge as to themselves and their acts and upon information and belief and the investigation of counsel as to all other matters as follows:

## NATURE  OF THE CASE

1.      Plaintiffs bring this case on behalf of renters of vehicles from Dollar Thrifty Automotive Group, Inc. (d/b/a Dollar Rent A Car); Dollar Rent A Car, Inc.; and DTG Operations, Inc. in connection with Dollar's misrepresentations about the true nature of "administrative fees" in connection with its rental vehicles.

2.      Since at least 2008, Dollar has charged its customers who travel on toll roads and use electronic toll collection ("ETC") service, $15 or $25 per toll in addition to the cost of tolls, misdescribing these $15 or $25 charges as administrative fees in the materials comprising Dollar's standardized rental contracts.

3.      But Dollar's self-described administrative fees (sometime called "administration fees") were anything but.  In truth, the administrative cost of Dollar's ETC is only a fraction of these $15 or $25 charges.  The vast bulk of the charge (and all successive $15 or $25 charges per toll) is a means to charge more for customers' rentals without including this price increase in customers' stated base rental rates.  In so doing, Dollar lies to customers that its rental rates are less than what Dollar is actually advertising and charging.

2

4.     From 2008 until sometime before November 2011, Dollar charged its ETC customers a per toll administrative fee of $25.  By November 2011, Dollar had reduced this fee from $25 per toll to $15 per toll and had capped the amount of the "administrative fees" at $105. So for instance, if a Dollar customer traveled on the Oklahoma Turnpike and incurred four $2 tolls on the way to and from this renter's destination, this renter's total charge would be $68: $8 for the tolls and $60 in administrative fees.  Had this same situation occurred before November 2011, this renter's total charge would have been $108, with $100 in purported administrative fees.  In fact, these charges are over 100 times what it costs to administer the ETC program and simply Dollar's way to increase its base rental cost under the guise of calling the increase a 'fee to cover the cost of processing' the toll a means appear to maintain low base rental rates and compete with other major rental car companies.

5.     Dollar's misrepresentation of these charges as processing costs, is dramatically illustrated by the contracts between Dollar's ETC service providers, Rent A Toll, Ltd. ("RTL") and American Traffic Solutions, Inc. ("ATS") and the Florida Department of Transportation, Florida's Turnpike Enterprise ("FTE").   Under these contracts, FTE charges the service providers $0.06 per toll incurred and charges the service providers 8% of the gross monthly tolls incurred. Thus,  for example, assuming Dollar rented 1,000 cars in a month and each car incurred 4 toll charges @ $1.00 per toll, the administrative fee/toll would be $560.[1]  But Dollar would collect $60,000 from its customers ($15 x4000 tolls) – an additional $59,440 or *107 times* more than the cost imposed by the Florida Turnpike Authority.

6.     Moreover, even compared to other national car companies 'costs' Dollar charges it customers' fees' that are at least three, and as much as twenty-six times, that of its competitors.

---

[1]  $0.06 per toll x 4000 tolls/month = $240; 8% of $4000/gross toll amount = $320. Total: $320 +

3

Dollar, unlike all other major car company imposes its $15 fee on a "per toll" basis while every other company charges a daily administrative fee rate.  As the following graph illustrates, a consumer who incurs even one toll in a Dollar rental car will pay nearly four times what they will pay if they rent a competitor's car.  If they incur two tolls in the same day (for example driving down and back along a highway), Dollar's administrative charge is 7.5 times that of the competition:



(*Source: [www.sunpass.com/rentalcar](www.sunpass.com/rentalcar) ; see also ¶37, infra.*)

7.    Further, every other car company has a maximum amount of administrative fees it charges for a given customer's rental period of between $16.95 and $19.75; with Hertz charging $24.95 for a rental month. Not Dollar. As a 'customer courtesy' Dollar agrees not to charge more than 7 administrative fees during a rental period, or no more than $105.[2] Here again, Dollar's administrative charges far outstrip all of its competition - even though it uses the same Service providers, see, ¶37 infra :

---

[2]  Of course, because Dollar charges 'per toll' if a customer incurred 7 or more tolls in one day, they would be charged $105, making Dollar's administrative charges 26.5 times its competition's day rate.



*(Source: [www.sunpass.com/rentalcar](www.sunpass.com/rentalcar) ; see also ¶37, infra.)*

8.     It is thus clear, that Dollar's statement, throughout its contractual documents, that the $15 per toll is an 'administrative' fee is simply not true and it is simply a means to increase the base cost for the rental of the car without saying so.  By lying about the administrative fee's true nature, Dollar is able to misrepresent the base price of the rental as being lower than it actually is, allows it to lure customers into believing that that are getting a low-priced rental when, in fact, they are not.

**THE ELECTRONIC-TOLL-COLLECTION INDUSTRY**

9.     ETC began in 1993, with the implementation of E-ZPass issued by New York State, which allowed motorists to bypass cash-toll lanes with a transponder and a registered account to debit the toll.  ETC lanes improve speed and efficiency of traffic flow, save time, reduce congestion and pollution, and increase fuel economy.  ETC also results in reduced accident rates and improved safety because slow-and-go-traffic is reduced.

10.     As a result of these benefits, in 1996, the U.S.  Department of Transportation sought to implement ETC systems in the 75 largest metropolitan areas within 10 years.  And according to the USDOT, as of 2004, 62 of the United States' metropolitan areas had met this

5

goal.  By 2006, private companies had not surprisingly become interested in providing ETC services, and by 2007, ETC was viewed as the preferred method for toll collection.

11.     RTL is a private company that provides ETC services.  Beginning in or before 2008, Dollar became RTL's major national rental-car-company customer.  RTL provided Dollar its ETC program called Pass24.  Pass24 was a program where for between $8 and $21 per day (depending on the market), Dollar would pay for any ETC tolls incurred by customers.  If customers did not choose Pass24 (and they did not have their own transponder), Dollar charged customers who traveled on ETC roads $25 per toll in addition to the toll charges, describing this additional cost in its standardized rental contracts as an administrative fee.

12.     In or about November 2012, Hertz Global Holdings, Inc., the parent company of Hertz Rent a Car, acquired Dollar.  Although Dollar operates as a separate entity from Hertz, sometime after that acquisition, Dollar switched its ETC contractor from RTL to ATS, the company that administers Hertz's ETC program.  The misconduct that Plaintiffs allege in this Complaint remained the same throughout the time that Dollar contracted with RTL for its Pass24 service and with ATS for its PlatePassT service.

13.     Thousands of people have been victimized by Dollar fabricated administrative fees.  Accordingly, Plaintiffs bring this action for breach of contract, including breach of the covenant of good faith and fair dealing, violation of state consumer-protection law, and unjust enrichment in order to recover Plaintiffs' and class members' damages and for injunctive relief.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction under 28 U.S.C. §1332(d).  The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action where Plaintiffs and class members are citizens of states different from Dollar.

15.     Venue is proper in this District under 28 U.S.C. §1391 because Dollar does business here and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in or emanated from here.  Dollar's principal place of business is also located in this District.

16.     Additionally, the materials creating Dollar's uniform rental contract, which materials include Dollar's website terms and conditions, require customers to bring disputes in this Court and apply Oklahoma law to the resolution regardless of choice-of-law issues:

> The laws of the State of Oklahoma shall govern this Agreement, without regard to the conflict of law principles thereof.  All disputes shall be conducted in a federal or state court sitting in Tulsa, Oklahoma.  The parties acknowledge and agree that jurisdiction and venue is [*sic*] proper in such court(s) and [are] convenient and waive any objection to such jurisdiction and venue, including, without limitation, that such forum is inconvenient.

See, www.dollar.com/disclaimer

## PARTIES

17.     Plaintiffs, Stephen Sallee and Anne Sallee, are citizens of Florida.  While preparing to travel to Texas, they rented a car from Dollar on the internet from their Florida home.  Dollar misrepresented the base rental price of the car and charged them false and inflated administrative fees during their rental, as set out below.

18.     Defendant Dollar Thrifty Automotive Group, Inc. (d/b/a/ Dollar Rent A Car) is a corporation organized and existing under Delaware law, with its principal place of business in Tulsa, Oklahoma.  Dollar Thrifty is wholly owned by Hertz Global Holdings. Inc.  At all relevant times, Dollar Thrifty rented (and continues to rent) cars to the public through its own website, www.dollar.com , third-party websites, and other means.

19.     Defendant Dollar Rent A Car, Inc. is a wholly owned subsidiary of Dollar Thrifty Automotive Group, Inc., is organized and exists under Oklahoma law, and has its principal place

7

of business in Tulsa, Oklahoma.  At all relevant times, Dollar Rent A Car rented (and continues to rent) cars to the public through its own website, www.dollar.com , third-party websites, and other means.

20.    Defendant DTG Operations, Inc. is a wholly owned subsidiary of Dollar Thrifty Automotive Group, Inc., is organized and exists under Oklahoma law, and has its principal place of business in Tulsa, Oklahoma.  At all relevant times, DTG rented (and continues to rent) cars to the public through its own website, www.dollar.com, third-party websites, and other means.

## BACKGROUND

21.    In the mid-1990s, ETC came to the forefront in toll collection with New York's adoption of the E-ZPass transponder system.  E-ZPass allowed customers who had setup an account, usually by registering a credit card and a license-plate number, to obtain a transponder that would signal a receiver when their vehicle passed through a toll lane, and the toll amount would be debited from the account.  The toll would be collected without the need to slow down and physically exchange cash, and traffic congestion would be reduced.

22.    According to a 2007 study entitled "Toll Collection Technology and Best Practices," conducted by the Center For Transportation Research ("ETC Study"), ETC is the preferred mechanism for toll collection.  ETC lanes improve traffic flow, save driver's time, reduce congestion and pollution, and improve fuel economy.  In addition, because fewer people are needed to operate an ETC system, overall costs per transaction are substantially less.  For example, the Oklahoma Turnpike, one of the first U.S. highways to use high-speed toll plazas, has seen a 90 percent reduction in collection costs on ETC lanes.

23.    Given its overall benefits, ETC continues to expand.  Many toll roads, bridges, and tunnels include ETC lanes.  And with the advancement of ETC technology, many roadways

have eliminated cash tolls altogether and now use ETC as their exclusive toll-collection method. According to the ETC Study, the ETC market is expected to experience double-digit growth from 2006-2016.

24.     With ETC's proliferation, it is not surprising that private firms have become interested in the ETC business.  In 2006, three companies, Highway Toll Administration, ATS, and RTL, were all reportedly developing strategies to capitalize on the ETC.

25.     Dollar's e-toll service electronically identifies Dollar vehicles as they travel through ETC sites.  This is accomplished by various means depending on the vehicle's location. Some transactions are captured and processed by recognizing license-plate numbers while others are captured through an electronic transponder device in the vehicle.  Once the identification is made, the e-toll service receives data identifying the Dollar vehicle and the tolls incurred on specific dates.  Dollar provided the company with whom it partnered to equip rental cars with ETC transponders (first, RTL, and, since Dollar's acquisition by Hertz, ATS) with its customers' personal identification and payment information, including their credit-card and debit-card information and the vehicles they rented.

26.     In 2006, RTL launched its tolling services and expanded its services by over 25% annual growth per year.  RTL promotes the use of its services as a revenue generator for its corporate clients, noting on its website under FAQ's that, "Rent A Toll electronic toll payment solutions provide many benefits for fleet managers, car rental companies and toll authorities, including: [g]eneration of incremental revenues."  Starting in or before 2008, Dollar was RTL's major national rental-car-company customer.  Dollar partnered with RTL to equip rental cars

430519.1

with ETC transponders and provide ETC services.[3]

27.     The following map depicts the states where RTL currently offers ETC services (and Plaintiffs believe that Dollar's ETC service area was the same or substantially the same during the period that RTL was Dollar's ETC provider):



---

[3] Dollar has offered an opt-in toll payment service where Dollar would pay a renter's tolls but charged the renter a flat daily fee of between $8-$21 per day (depending on the market) for the entire rental period, regardless of use.  Thus, if a customer rented a Dollar car for 10 days but traveled on an ETC road only once, the overall cost of Dollar's service (first, Pass24 and now PlatePass) was an additional $80 or $210.

10

28.     After Hertz's acquisition, Dollar changed its ETC service provider from RTL to ATS.  Plaintiffs believe that Dollar's ETC is now applied to the following service area:



29.     Although Dollar's ETC vendor changed from RTL to ATS, Dollar's contract terms have not changed.  Thus, regardless of Dollar's ETC vendor, at all times during which Dollar offered ETC service, Dollar misrepresents to its renters that its $15 or $25 per toll was an administrative fee for processing e-tolls But only a small fraction of these charges is for administering Dollar's e-toll program; the rest is simply a hidden increase to customers' base rental fees.  Dollar's lie about the true nature of its administrative fee, along with Dollar's failure to disclose its vehicles' true base-rental fees, is designed to induce customers to select

11

Dollar, for its purported lower rental rates, rather than selecting Dollar's competitors.

## DOLLAR RENT A CAR'S CONTRACTING PROCESSES

30.     Like most national rental car companies (e.g., Hertz, Avis, National, Enterprise), Dollar advertises its cars and prices nationally and conducts its business via the phone, internet and with in-person rentals.  According to Hertz 2013 Form 10-K/A, for 2013 (the first full year of the combined company) Hertz' advertising costs for all of its brands, including Dollar Thrifty, was $213.1 million. 2013 10-K/A, at 175.  Moreover, perhaps more than other major rental car companies, Dollar relies on the internet for its customers and rentals.  As Hertz noted in its 2012 SEC Form 10-K, filed shortly after its acquisition of Dollar Thrifty, "Our Dollar Thrifty brands have historically used the internet as their primary source of reservations.  As a result, [Hertz] expect[s] the percentage of reservations that come through the internet, particularly through our websites and third-party websites, to increase as a result of our acquisition of Dollar Thrifty." 2012 SEC Form 10-K, at 7.

31.     Dollar, Thrifty and Hertz maintained the brands independence and the reservation systems were also maintained separately.[4]  Dollar (and Thrifty) maintains centralized information systems in Tulsa, Oklahoma, and Dollar's communication with its business locations emanates from its headquarters in Tulsa, Oklahoma.

32.     Dollar's internet reservations take several forms, all of which, direct the customer to the key aspects of Dollar's rental contract.  For example, when customer rents a car through a third-party intermediary, like Expedia, a rental confirmation is sent to the customer's e-mail

---

[4]   However, after the acquisition, Hertz managed all three brands with a single management team.  Despite this unified management, Hertz, Dollar and Thrifty continued to maintain separate airport counters, reservations and reservation systems, marketing, and all other customer contact activities. 2012 SEC Form 10-K.

address, and it displays the rental-car description along with a link to Dollar's "Terms and Conditions," under a Rules and Policies section.

33.     The rental confirmation directs the consumer to "Please refer to the Terms and Conditions for more information." Once the consumer clicks through that link, he or she is presented with the "Terms and Conditions" of the rental and the "Disclaimer," which explains the Oklahoma venue and law requirement, *see supra* ¶ 16.

34.     When reservations are completed through Dollar's own website, the "Terms and Conditions" and the "Disclaimer" are likewise part of the rental process.  Dollar has a four-step process by which the consumer identifies his or her destination and dates of rental (Step 1); chooses the car and daily rate (Step 2); adds any options such as car seats, GPS (Step 3); fills in his or her personal information-name, email, and phone number (Step 4).  At Step 4, Dollar provides a link to its "Terms and Conditions" and its "Disclaimer," which provides the same Oklahoma venue and law requirement as the third-party link.  Thus, each internet rental includes Dollar's Terms and Conditions and Disclaimer, whether the rental is from Dollar's website or a third party's.

## DOLLAR'S PURPORTED ADMINISTRATIVE FEES CAN BE OVER 100 TIMES THE COST FOR OF ITS ETC PROGRAM AND ARE SIMPLY NOT ADMINISTRATIVE COSTS

35.     Contracts obtained from the Florida Turnpike Authority show that ATS and RTL entered into "Marketing and Operations Agreement(s) for Rental Car Toll Collection Services" with the FTE as Service Providers for national rental car companies, including Dollar Thrifty, and Hertz (Dollar Thrifty's parent company).  Under the terms of the contract, FTE charged the Service Providers a video toll processing fee of $0.06 for each video or image based transaction

13

paid from the Service Provider's prepaid account.[5]   In addition, FTE charged the Service Provider's prepaid account each month with an administrative maintenance fee of 8% of the monthly gross amount of all tolls paid.  Thus, for example, assuming Dollar rented 1,000 cares in a month and each car incurred 4 toll charges @ $1.00 per toll, the administrative fee/toll would be $560[6]. But Dollar would collect $60,000 from its customers ($15 x 4000 tolls) – an additional $59,440. or *107 times* more than the cost imposed by the Florida Turnpike Authority.

36.     Given that the actual costs of the ETC program are so low it is not surprising that every other competitor (and Dollar's parent company, Hertz) can charge a fraction of Dollar's purported "administrative fee" for the same service (often with the same service provider). As the table shows, Dollar's *per toll* charge over three times the *per-day* toll charge of every other company. [7]

| RENTAL COMPANY | SERVICE PROVIDER | ADMINISTRATIVE FEE |
| --- | --- | --- |

---

[5]  Under the contract, each Service Provider is required to maintain a prepaid toll account with a required minimum account balance of 50% of the monthly average over the last six months of toll usage, adjusted quarterly.  Like consumers with ETC accounts, the prepaid account is only drawn on to pay the tolls.

[6] $0.06 per toll x 4000 tolls incurred in the month= $240; 8% of $4000/gross toll amount = $320. Total: $320 + $240= $560.

[7]  https://www.sunpass.com/rentalcar

| RENTAL COMPANY | SERVICE PROVIDER | ADMINISTRATIVE FEE |
|---|---|---|
| Alamo | HTA | $3.95 per usage day that customer incurs tolls ($19.75 maximum fee per rental period) |
| Avis | e-Toll | $3.95 charge per day ($16.95 maximum per rental month) |
| Budget | e-Toll | $3.95 charge per day ($16.95 maximum per rental month) |
| Dollar | ATS | $15 per occurrence (Maximum charge of $105 per rental period) |
| Enterprise | HTA | $3.95 per usage day that customer incurs tolls ($19.75 maximum fee per rental period) |
| Hertz | ATS | $4.95 charge per day ($24.95 maximum per rental month) |
| National | HTA | $3.95 per usage day that customer incurs tolls ($19.75 maximum fee per rental period) |

Moreover as the graphs set out in ¶¶6-7, *supra*. reveal,  if multiple tolls are incurred on the same day, the disparity between Dollar's purported fees and those of every other major  rental car company  is even greater. This is true even for Dollar's parent company Hertz - even though Dollar now uses the same service provider.

37.     This is clearly by design. As Hertz notes in its 2012 10-K, explaining that even though Dollar, Thrifty, and Hertz are operated as separate brands, they are managed by the same team, thus revealing Dollar's plan to misrepresent and conceal its increased base-rental costs by calling its price increase an administrative fee. Indeed, in its 2013 10-K/A, Hertz acknowledges that Dollar Thrifty are "value brands" appeal to leisure customers and that 'leisure rentals, generally, are longer in duration and generate more revenue per transaction than do business rentals". 2013 Form 10-K/A, at 22. Since customers are more cost conscious in making leisure rentals, it is extremely important to provide the low prices in order to lure customer. By hiding the rental cost as an administrative fee Dollar can do so and reap the benefit, albeit, improperly and illegally, of increased rental revenue at the same time.

15

### IMPOSITION OF FALSE AND EXCESSIVE ADMINISTRATIVE
### CHARGES ON PLAINTIFFS AND THE CLASS

38.     Dollar has over 570 rental locations in 61 countries, including approximately 260

locations in the U.S. and Canada.   According to Hertz's 2012 10-K, Dollar has used, and

continues to use, the Internet as its primary source of reservations.

39.     Dollar's centralized information systems are located in Tulsa, Oklahoma, which

systems connect to the rental locations that Dollar serves nationwide.

40.     Like all rental-car companies, Dollar competes for business primarily based on

price:

> The markets in which we operate are highly competitive.   We
> believe that price is one of the primary competitive factors in the
> car and equipment rental markets and that the Internet has enabled
> cost-conscious customers, including business travelers, to more
> easily compare rates available from rental companies.  If we try to
> increase our pricing, our competitors, some of whom may have
> greater resources and better access to capital than us, may seek to
> compete aggressively on the basis of pricing.

Hertz 2012 10-K at 45.

41.     Thus, Dollar seeks to maximize its profits while keeping its stated rates low

enough to compete effectively with other rental-car companies.   Indeed, the front page of Dollar

Rent a Car's website proclaims that it is "Home of Our Lowest Rates: Guaranteed!" One means

of maintaining the "lowest rates" is to hide increases in the rental rate in other charges.   Dollar

car-rental customers execute standardized rental contracts, which set out the terms, charges and

conditions of the rental arrangement.   Whether the rental is accomplished through its website or

by other means, Dollar explains that if renters "choose not to select the PlatePassT pre-paid

tolling option and travel on one of these all-electronic toll roads, and do not have [their] own

tolling device in the vehicle, the applicable toll will be paid for [them] and an administrative fee

16

of $15.00 [formerly $25] per occurrence with a maximum of $105.00 will be charged."

42.     Dollar's representation that the charge of $15 or $25 per toll is an administrative fee is materially false and misleading and in breach of Dollar's contracts with renters because despite Dollar's explanation, Dollar's charge is actually *not* an administrative fee; it's a veiled, mischaracterized, and undisclosed profit center that also misdescribes Dollar's actual daily rental rate.

43.     In truth, Dollar's administration of its ETC program is only a fraction of the amount that Dollar represents as administrative fees.  Instead, most of the money that Dollar collected from customers as supposed administrative fees was simply increased rental income, which allowed Dollar to misrepresent its stated base rental rates as being lower than they in fact are, had Dollar truthfully represented what its $15 or $25 cost per toll really was.

44.     By representing that its $15 or $25 per toll charge was an administrative fee relating to its collaboration with RTL or ATS, when the administrative cost of these toll programs is not nearly that high, Dollar breached its contracts with its customers by charging more for customers' rentals without including or otherwise disclosing its rental-price increase to them.

## FACTS RELATING TO PLAINTIFFS

45.     Plaintiffs, Anne and Stephen Sallee, are married, are and at all relevant periods, have been and are residents of Oakland Park, Florida.

46.     On November 13, 2013, plaintiffs, from their home in Oakland Park, used the internet to reserve a Dollar rental car through one a third-party website, the Travel Rewards

430519.1

Center, operated by Bank of America.[8] That site linked them to Dollar, which sent them a confirmation of their reservation of a full-size Nissan Altima, to be picked up at the Dallas Fort Worth Airport on November 28, 2013 and returned on November 29, 2013.

47.     The confirmation provided that the rental was subject to "Rules and Polices" and provided a link to Dollar's websites' "Terms and Conditions" page for more terms and other charges that customers would incur and other binding conditions.   The link also led to Dollar's "Disclaimer," which required all lawsuits arising out of Dollar's website to be brought in Tulsa Oklahoma, and be subject to Oklahoma law.

48.     On November 26, 2013, Plaintiffs traveled from Florida to DFW.   Before leaving the airport, Plaintiffs visited the Dollar office to pick up the vehicle they had previously reserved.   At the office they were presented with a standard Dollar rental agreement for their signature, which Stephen Sallee signed and thereafter picked up the rental car.

49.     Plaintiffs took the North Texas Highway to attend a family funeral service. On the way, Plaintiffs incurred two tolls.   On their return trip, they incurred these same two tolls.

50.     On November 29, 2013, Plaintiffs returned the rental car to Dollar's DFW location.   At that time, Dollar's agent advised Plaintiffs that were no additional charges.

---

[8]   As noted, much of Dollar/Thrifty's business came from Internet reservations.   In addition, Hertz also noted in its 2012 SEC 10-K that many of these reservations came from third-party websites that, in turn, were redirected to Dollar ("When customers reserve cars for rental from us and our licensees, they may seek to do so through travel agents or third-party travel websites.   In many of those cases, the travel agent or website will utilize a third-party operated computerized reservation system, also known as a Global Distribution System, or "GDS," to contact us and make the reservation."). 2012 SEC 10-K, at 17.

51.     On or about December 19, 2013, Plaintiffs received a notice from Dollar Processing Center entitled "Dollar Rent A Car Toll Charge Notice."(the "Notice").   The notice indicated that on November 26, 2013, Plaintiffs' rental car incurred a toll charge of $.94 at approximately 11:32 a.m. and a second charge at approximately 11:37 a.m., totaling $1.41.  The Notice also explained that on November 29, 2013, Plaintiffs' rental car incurred a charge of $1.41 at approximately 10:51 a.m. and a second charge of $.94, at approximately 10:55 a.m. for a total toll charge of $4.70.

52.     The Notice stated, "The toll amount plus a $15 administrative fee per toll has been assessed.  As a customer courtesy, your rental agreement will only incur a maximum of seven administrative fees" As the Sallee's had incurred four tolls, they did not reach the maximum and were only assessed four $15 charges for a total of $60 in administrative fees. Thus, plaintiffs were told that they owed Dollar $64.70, which was due on January 3, 2014.

53.     Dollar attempts to pass off its $15 per toll charge as a cost it incurs for providing its ETC service.  Accompanying the Notice was a one-page document entitled "FAQ-Frequently Asked Questions".   The first question, "Why was I charged an administration fee?" provides the following explanation:

> Per your rental agreement, **an administration fee was charged to cover the costs of processing** your citation on behalf of the Rental Car Company.  Processing included either transferring liability of the citation out of the Rental Car Company's name into your name or paying the citation.  The Issuing Authority generally dictates whether a payment or a Transfer of Liability is allowed for a particular citation.  The benefit to you for transferring liability is that you retain due process and can contest your ticket with the Issuing Authority of you so choose. (Emphasis added).

54.     After receiving this Notice, plaintiffs contacted Dollar to dispute the charges but were sent a perfunctory response that referred them to their rental agreement and concluded by

saying, "Thank you once again, Mr. Sallee, for taking the time to notify us of this situation.  We look forward to serving you again soon at Dollar Rent A Car." The Sallees subsequently paid the charges out of their joint checking account.

55.     As noted, Dollar's purported explanation that is administration fee is charged to "cover the cost of processing" toll citations is untrue.  Instead, Dollar charges its customer over 100 times the *actual* cost imposed by the toll authority to pay its tolls and necessary to "process [a customer's] citation . . . ." Moreover, Dollar's $15 per occurrence charge is at least three times the amount charged by nearly every other rental car company, including its parent company, Hertz, which uses the same toll collection administrator for its toll collection.   Dollar has determined that it can increase its return on a rental by misrepresenting an increase in its rental amount as a cost and thereby continue to compete against other companies on price by maintaining a low (and false) stated base rate.

## DOLLAR'S MATERIAL MISREPRESENTATIONS DAMAGED PLAINTIFFS AND THE CLASS

56.     In its rental contracts, Dollar has lied about and hidden material facts regarding its true base-rental charges, by misrepresenting additional charges to the rental cost and mischaracterizing them as administrative fees.  Dollar is, and was, in a superior position to know such facts and information, and such information is within Dollar's exclusive knowledge and unknown to Plaintiffs and the Class.  Without the foregoing information, consumers cannot determine just what true costs and obligations they will incur to rent vehicles from Dollar.

57.     Dollar has misrepresented additional rental costs as administrative fees, which has misled and caused damage to consumers, including Plaintiffs and the Class.

58.     In addition to breaching its contracts with its customers, Dollar's course of conduct set out above is ongoing and adverse to the public interest and policies underlying

20

consumer protection laws.  Unless enjoined and restrained by an order of this Court, Dollar will continue to engage in the unlawful acts and practices set out herein.  Such acts and conduct have caused ascertainable loss and actual damage to consumers, including Plaintiffs and the Class, and unless enjoined by the Court, Dollar will continue to cause monetary loss to Plaintiffs, Class Members, and future Dollar rental car customers.

## CLASS ACTION ALLEGATIONS

59.     Plaintiffs bring this action as a class action according to Federal Rules of Civil Procedure 23(b)(2) and (b)(3) on behalf of themselves and all Dollar customers who rented Dollar vehicles and who paid Dollar's $15 or $25 per toll fee.  Excluded from Plaintiffs' class are (a) Dollar and any entity in which Dollar has a controlling interest; (b) Dollar's employees, officers, directors, agents, and representatives and their family members; (c) class counsel, employees of class counsels' firms, and class counsels' immediate family members; and (d) the presiding judge and magistrate judge and any of their immediate family members.

60.     Plaintiffs also bring this action on behalf of themselves and all Dollar customers residing in Florida who rented Dollar vehicles and who paid Dollar's $15 or $25 per toll administrative fee.  Excluded from Plaintiffs' Florida class are (a) Dollar and any entity in which Dollar has a controlling interest; (b) Dollar's employees, officers, directors, agents, and representatives and their family members; (c) class counsel, employees of class counsels' firms, and class counsels' immediate family members; and (d) the presiding judge and magistrate judge and any of their immediate family members.

61.     Plaintiffs paid Dollar's $15 per toll administrative fees in connection with their vehicle rentals; therefore, they are class members.

62.     Plaintiffs can identify and ascertain all other class members from Dollar's records.

Those records are computerized and are largely generated by online rentals. Those records reflect which customers were charged and paid Dollar's administration fee. Thus, the classes are ascertainable.

63.     Plaintiffs do not know the exact size of the classes because this information is in Dollar's exclusive control. But based on the nature of the commerce involved, Plaintiffs believe the class members number in the thousands and that class members are dispersed throughout the U.S., including Florida. Therefore, joinder of all class members would be impracticable.

64.     Plaintiffs' claims are typical of other class members' claims because Plaintiffs and class members paid Dollar's $15 or $25 per toll administrative fee.

65.     Common legal or factual questions predominate within the classes, including but not limited to:

> a.     Whether Dollar's uniform misrepresentation, omission, or misconduct concerning its administrative fee breached Dollar's contracts with Plaintiffs and class members;
>
> b.     Whether Dollar's uniform marketing and misrepresentation of its additional rental costs as an administrative fee violated the Oklahoma or Florida consumer-protection laws;
>
> c.     Whether Dollar was unjustly enriched as the result of its uniform misrepresentation, omission, or misconduct;
>
> d.     Whether Dollar's conduct injured Plaintiffs and class members;
>
> e.     Whether as a result of Dollar's wrongdoing, Plaintiffs and class members sustained damages and are entitled to damages and/or restitution and if so, the proper measure and appropriate formula for determining their damages and/or restitution; and
>
> f.     Whether Dollar owes injunctive relief to Plaintiffs and class members.

66.     Plaintiffs will fairly and adequately represent and protect class members' interests and have no interests that conflict with or are antagonistic to class members' interests.

Moreover, Plaintiffs' attorneys are experienced and competent in complex class-action litigation.

67.     Class certification is the superior procedural method for fairly and efficiently adjudicating Plaintiffs' claims because:

a.      Common questions of law or fact predominate over any individual questions that exist within the classes;

b.      Each class member's damage claim is too small to make individual litigation an economically viable possibility, and few class members likely have any interest in individually controlling the prosecution of separate actions;

c.      Class treatment is required for optimal deterrence and compensation and for determining the Court-awarded reasonable legal fees and expenses;

d.      Despite the relatively small size of each class member's claim, the aggregate volume of their claims—coupled with the economies of scale inherent in litigating similar claims on a common basis—will enable class counsel to litigate this case on a cost-effective basis; and

e.      Plaintiffs anticipate no unusual difficulties in this class action's management in that all legal and factual questions are common to the class.

68.     Class certification is appropriate under Federal Rule 23(b)(2) because Dollar has acted on grounds generally applicable to Plaintiffs and the class members, all of whom are at imminent risk of irreparable harm by Dollar having charged, and continuing to charge, its illegal administrative fee and all of whom are entitled, as a result, to a declaration that establishes their rights and Dollar's duties with respect to Dollar's administrative fee.

## COUNT I
### Breach of Contract under Oklahoma Law
### (Applicable to the Nationwide Class)

69.     Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth in this Count.

70.     By renting a vehicle from Dollar (i.e., by Plaintiffs accepting Dollar's offer to rent

a vehicle for which Plaintiffs paid money and Dollar providing Plaintiffs a vehicle), Plaintiffs contracted with Dollar.  Comprising Plaintiffs' contract was Dollar's website content (to which Dollar's third-party vendor directed Plaintiffs as part of the rental-reservation process) and the rental agreement that Plaintiffs signed when they picked up their vehicle.  All of these materials are standardized across all of Dollar's rental agreements.

71.     Plaintiffs' contract contained a daily-rental price, listed no add-ons, and included an Oklahoma choice-of-law and venue clause, and described an administrative fee associated with Dollar's ETC in the event they did not enroll for Pass24/PlatePassT and incurred toll charges.

72.     In fact, the vast bulk of Dollar's charges represented to be administrative fees was *not* actually for administrative fees and was *not* "charged to cover the costs of processing [a customer's] citation on behalf of the Rental Car Company," but was rather an additional, hidden rental charge for Plaintiffs' vehicle.  Dollar breached its contract with Plaintiffs by misrepresenting its administrative fee's true purpose and by raising Plaintiffs' daily rental rate.

73.     As a result of Dollar's breach, Plaintiffs paid more to Dollar than they should have paid for their vehicle rental.  In this manner, Dollar's breach of contract proximately caused Plaintiffs damages.

### COUNT II
### Violation of the OCPA, 15 Okl. Stat. § 751 *et seq.*
### (Applicable to the Nationwide Class)

74.     Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth in this Count.

75.     By misrepresenting the true nature and purpose of its ETC "administrative fees" (i.e., failing to disclose that it was actually an additional rental charge, that Dollar was charging

24

its customers a higher rental than they agreed to, which was not really for the purpose of "cover[ing] the costs of processing [customers'] citation[s] on behalf of the Rental Car Company"), Dollar committed an unlawful practice under 15 Okl. Stat. § 753.

76.    Dollar's unlawful practice occurred in the course of its business operations.

77.    As a result of Dollar's unlawful practice, Plaintiffs paid more to Dollar than they should have paid for their vehicle rental.  In this manner, Dollar's unlawful practice and violation of the OCPA proximately caused Plaintiffs' injury in their capacity as consumers.

**COUNT III**
**Unjust Enrichment under Oklahoma Law**
**(Applicable to the Nationwide Class)**

78.    Plaintiffs repeat and re-allege the allegations of the foregoing paragraphs as if fully set forth in this Count.

79.    Plaintiffs' payment to Dollar of more than they should have for their vehicle rental, as a result of Dollar's misrepresentation of the rental charges and Dollar's misrepresentation that its "administration fee was charged to cover the costs of processing [customers'] citation[s] on behalf of the Rental Car Company," constituted an enrichment to Dollar that was coupled with a resulting injustice to Plaintiffs.

80.    In this manner, Dollar is not only responsible for having illegally charged Plaintiffs for unlawful additional rental costs disguised as an administrative fee, but by having done so Dollar received an economic benefit.

81.    Consequently, Plaintiffs seek restitution and disgorgement of all unjustly retained money that Dollar obtained through its unlawful conduct.

25

## COUNT IV
### Breach of Contract under Florida Law
### (Applicable to the Florida Class)

82.     Plaintiffs repeat and reallege the allegations of the foregoing paragraphs as if fully set forth in this Count.

83.     By then renting a vehicle from Dollar (i.e., by Plaintiffs accepting Dollar's offer to rent a vehicle for which Plaintiffs paid money and Dollar Plaintiffs a vehicle), Plaintiffs contracted with Dollar.  Comprising Plaintiffs' contract was Dollar's website content (to which Dollar's third-party vendor directed Plaintiffs as part of the rental reservation process) and the rental agreement that Plaintiffs signed when they picked up their vehicle.  All of these materials are standardized across the U.S.

84.     Plaintiffs' contract contained a daily rental price, listed no add-ons, and included an Oklahoma choice-of-law and venue clause, and described an administrative fee associated with Dollar's ETC in the event they did not enroll for Pass24 or PlatePassT and incurred toll charges.

85.     In fact, the vast bulk of Dollar's charges represented to be "administrative fees" was not actually for administrative fees and was not "charged to cover the costs of processing [a customer's] citation on behalf of the Rental Car Company" but was rather an additional, hidden rental charge for the vehicle.  Dollar breached its contract with Plaintiffs, by misrepresenting its "administrative fee's" true purpose and by raising Plaintiffs' daily-rental rate.

86.     As a result of Dollar's breach, Plaintiffs paid more to Dollar than they should have paid for their vehicle rental.  In this manner, Dollar's breach of contract proximately caused Plaintiffs' damages.

26

## COUNT V
### Violation of the FDUTPA, Fla. Stat. § 501.201 *et seq.*
### (Applicable to the Florida Class)

87.     Plaintiffs repeat and re-allege the allegations of the foregoing paragraphs as if fully set forth in this Count.

88.     Dollar's vehicle rental to Plaintiffs constituted trade or commerce under Fla. Stat. §501.203(8).

89.     By misrepresenting the true nature and purpose of its ETC "administrative fees" (i.e., failing to disclose that it was actually an additional rental charge, that Dollar was charging its customers a higher rental than they agreed to, which was not really for the purpose of "cover[ing] the costs of processing [customers'] citation[s] on behalf of the Rental Car Company"), Dollar committed an unconscionable act or practice and/or deceptive act or unfair practice in the conduct of trade or commerce under Fla. Stat. § 501.204, which unconscionable act or practice and/or deceptive act or unfair practice in the conduct of trade or commerce would likely have deceived a reasonable person under the same circumstances as Plaintiffs.

90.     Dollar's deception misled Plaintiffs and misled other reasonable consumers to their detriment.

91.     As a result of Dollar's unconscionable act or practice and/or deceptive act or unfair practice in the conduct of trade or commerce, which unconscionable act or practice and/or deceptive act or unfair practice in the conduct of trade or commerce was substantial; was not outweighed by any countervailing benefits to consumers; and injured Plaintiffs and consumers in a manner that could not reasonably have been avoided, Plaintiffs paid more to Dollar than they should have paid for their vehicle rental.  In this manner, Dollar's unconscionable act or practice and/or deceptive act or unfair practice proximately caused actual damages to Plaintiffs.

27

**COUNT VI**
**Unjust Enrichment under Florida Law**
**(Applicable to the Florida Class)**

92.    Plaintiffs repeat and re-allege the allegations of the foregoing paragraphs as if fully set forth in this Count.

93.    As a result of Dollar's misrepresentations, by paying to Dollar more than they should have paid for their vehicle rental, Plaintiffs conferred a benefit on Dollar.

94.    By charging Plaintiffs this increased rental cost as an administrative fee and by keeping it, Dollar appreciated this conferred benefit.

95.    In this manner, Dollar accepted and retained Plaintiffs' benefit under circumstances that make it inequitable for Dollar to retain this benefit without paying its value to Plaintiffs.

96.    Consequently, Plaintiffs seek restitution and disgorgement of all unjustly retained money that Dollar obtained through its unlawful conduct.

**COUNT VII**
**Breach of the Implied Covenant of Good Faith and Fair Dealing under Oklahoma Law**
**(Applicable to the Nationwide Class)**

97.    Plaintiffs repeat and re-allege the allegations of the foregoing paragraphs as if fully set forth in this Count.

98.    The contract formed between Dollar and Plaintiffs was subject to the implied covenant that Dollar would conduct its business with Plaintiffs in good faith and would fairly deal with them.

99.    Dollar breached this implied covenant by breaching its contract with Plaintiffs, by charging administrative fees which were not "charged to cover the costs of processing [a customer's] citation on behalf of the Rental Car Company" but was rather an additional, hidden

28

rental charge for the vehicle.  Dollar breached the implied covenant it had with Plaintiffs, by misrepresenting its "administrative fee's" true purpose and by raising Plaintiffs' daily-rental rate.

100.    Plaintiffs have been damaged as a direct and proximate result of Dollar's breach of the implied covenant of good faith and fair dealing.

**COUNT VIII**
**Breach of the Implied Covenant of Good Faith and Fair Dealing Under Florida Law**
**(Applicable to the Florida Class)**

101.    Plaintiffs repeat and re-allege the allegations of the foregoing paragraphs as if fully set forth in this Count.

102.    The contract formed between Dollar and Plaintiffs was subject to the implied covenant that Dollar would conduct its business with Plaintiffs in good faith and would fairly deal with them.

103.    Dollar breached this implied covenant by breaching its contract with Plaintiffs, by charging administrative fees which were not "charged to cover the costs of processing [a customer's] citation on behalf of the Rental Car Company" but was rather an additional, hidden rental charge for the vehicle.  Dollar breached the implied covenant it had with Plaintiffs, by misrepresenting its "administrative fee's" true purpose and by raising Plaintiffs' daily-rental rate.

104.    Plaintiffs have been damaged as a direct and proximate result of Dollar's breach of the implied covenant of good faith and fair dealing.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the alternative classes, request the following relief:

    A.    An order certifying this action as a class action, appointing Plaintiffs as representatives of the Nationwide class, or, alternatively as representatives of the Florida class, and appointing their attorneys as class counsel;

29

B.      Under Count I, an order awarding damages related to Dollar's breach of contract;

C.      Under Count II, an order awarding all damages, expenses, and attorneys' fees under 15 Okl. Stat. § 761.1(A), as well as declaratory relief under 15 Okl. Stat. § 761.1(A) and (B) and injunctive relief under 15 Okl. Stat. § 761.1(C);

D.      Under Count III, an order establishing a constructive trust and disgorging Dollar of its illegal profits or requiring Dollar to pay restitution into the constructive trust based on its unjust enrichment;

E.      Under Count IV, an order awarding damages related to Dollar's breach of contract;

F.      Under Count V, an order awarding all damages, attorneys' fees, and costs under Fla. Stat. § 501.2105 and Fla. Stat. § 501.211, as well as declaratory and injunctive relief under Fla. Stat. § 501.211;

G.      Under Count VI, an order establishing a constructive trust and disgorging Dollar of its illegal profits or requiring Dollar to pay restitution into the constructive trust based on its unjust enrichment;

H.      Under Count VII, an order awarding damages related to Dollar's breach of the implied covenant of good faith and fair dealing.

I.      Under Count VIII, an order awarding damages related to Dollar's breach of the implied covenant of good faith and fair dealing

J.      Any other relief that the Court deems appropriate and just under the circumstances.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury.

Dated: August 15, 2014                 Respectfully submitted,

                                       */s/ Jeffrey W. Lawrence*
                                       LAWRENCE LAW FIRM
                                       101 California Street, Suite 2710
                                       San Francisco, CA 94104
                                       Tel: (415) 504-1601
                                       Fax: (415) 504-1605
                                       E-mail: jeffreyl@jlawerncelaw.com

30

430519.1

Tony M. Graham
OK, 3524
R. Jack Freeman
OK, 3128
GRAHAM & FREEMAN, PLLC
6226 E. 101st Street, Suite 300
Tulsa, OK 74137
Tel: (918) 298-1716
Fax: (918) 298-1728
E-mail: tgraham@grahamfreeman.com

Bruce D. Greenberg
Jeffrey A. Shooman
LITE DEPALMA GREENBERG, LLC
Two Gateway Center, Suite 1201
 Newark, NJ  07102
Tel:  (973) 623-3000
Fax:  (973) 623-0858
E-mail: bgreenberg@litedepalma.com
jshooman@litedepalma.com

Daniel R. Karon
Laura K. Mummert
GOLDMAN SCARLATO KARON
  & PENNY, P.C.
700 W. St. Clair Ave., Suite 200
Cleveland, OH 44113
Tel: (216) 622-1851
Fax: (216) 241-8175
E-mail: karon@gskplaw.com
mummert@gskplaw.com

*Attorneys for Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, do hereby certify that a true and correct copy of Plaintiffs' First

Amended Class Action Complaint Jury Trial Demanded was sent on the 15th day of August,

2014, via electronic notice through the Court to:

**HALL, ESTILL, HARDWICK, GABLE, GOLDEN &NELSON, P.C.**
Sarah Jane Gillett, OBA No. 17099
320 South Boston Avenue, Suite 200
Tulsa, Oklahoma 74103-3705
sgillett@hallestill.com
*Attorney for Defendants*

**JENNER &BLOCK LLP**
John F. Ward, Jr., 1ll. ARDC No. 6208004
(pro hac vice)
353 North Clark Street, 41st Floor
Chicago, Illinois 60654-4704
jward@jenner.com
*Attorney for Defendants*

                                       */s/Jeffrey W. Lawrence*
                                            Jeffrey W. Lawrence

430519.1